STATE OF NORTH CAROLINA, EX REL. COMMISSIONER OF INSURANCE v. NORTH CAROLINA FIRE INSURANCE RATING BUREAU

No. 35

(Filed 4 November 1976)

1. Insurance § 116— changes in extended coverage insurance — two methods

The two methods by which changes in premium rates for extended coverage insurance may be put into effect are: (1) the Rating Bureau may file with the Commissioner of Insurance, for approval by him, a proposal for such change, either an increase or a decrease; and (2) the Commissioner, on his own initiative, may, after investigation, order a reduction or an increase in the premium rate when necessary to enable the operating companies to earn upon policies written in N. C. a fair and reasonable profit. G.S. 58-131.1; G.S. 58-131.2.

Comr. of Insurance v. Rating Bureau

2. Insurance § 116— withdrawal of rate filing

The Fire Insurance Rating Bureau acted within its rights in withdrawing an extended coverage rate filing before the Commissioner of Insurance took any action upon the filing and before the filing could go into effect pursuant to the "deemer" provision of G.S. 58-131.1.

3. Insurance § 116— extended coverage insurance — withdrawal of rate filing — authority of Insurance Commissioner

When the Fire Insurance Rating Bureau withdrew its extended coverage rate filing, the matter was then as if no filing had ever been made so far as the Insurance Commissioner's authority to order a change in the premium rate was concerned, and the only method available to the Commissioner for bringing about a change in the premium rate was an independent investigation and action pursuant to G.S. 58-131.2.

4. Insurance § 116— withdrawn rate filing — competency in subsequent hearing

A rate filing which had been withdrawn by the Rating Bureau, together with the statistical data attached thereto, would be competent in evidence at a properly convened hearing before the Commissioner of Insurance, pursuant to G.S. 58-131.2, as an admission by the Bureau that, as of the date of the filing, the therein proposed rates would be sufficient to yield to the companies (considered as one) a fair and reasonable profit upon their N. C. extended coverage business; however, at such hearing it would be subject to correction, clarification or modification by evidence of inconsistent or more recent information.

5. Insurance § 116— extended coverage rates — failure of Rating Bureau to request hearing

Failure of the Rating Bureau to request a hearing on the merits of extended coverage rates pursuant to G.S. 58-131.5 did not obviate the necessity of a public hearing where the Rating Bureau had withdrawn its filing and had no notice that the Commissioner of Insurance contemplated a change in the premium rate pursuant to an independent investigation as authorized by G.S. 58-131.2.

6. Insurance § 116— hearing on extended coverage rates — absence of notice — arbitrary and capricious order

Where the Commissioner of Insurance gave no notice to the Fire Insurance Rating Bureau of his intent to convert a contemplated hearing on the Rating Bureau's motion to vacate a "letter order" entered by the Commissioner into an independent investigation of the reasonableness of existing premium rates for extended coverage insurance pursuant to G.S. 58-131.2, the resulting order reducing extended coverage rates must be deemed arbitrary and capricious and may be reversed by the reviewing court pursuant to G.S. 58-9.6(b).

7. Insurance § 116— extended coverage rates — decrease of 19% — material change — necessity for public hearing

A decrease of 19% in extended coverage rates is a material change in the rate level within the meaning of the Insurance Advisory

Board rule requiring a public hearing when such a change is involved, and the Commissioner of Insurance may not deny a hearing when he decides to embark upon an independent investigation, designed to produce a rate reduction of 19%, by finding that this is not a material change in the rate level.

8. **Insurance § 116— extended coverage rates — applicability of "deemer" provision**
    The "deemer" provision of G.S. 58-131.1 has application only when there is before the Commissioner of Insurance for his approval a filing by the Rating Bureau.

9. **Insurance § 116— extended coverage rates — independent investigation by Insurance Commissioner — necessity for notice and hearing**
    G.S. 58-27.1(c) and the rules of the Insurance Advisory Board adopted pursuant thereto forbid the Commissioner of Insurance, acting on his own motion pursuant to G.S. 58-131.2, to order a material reduction in premium rates for extended coverage insurance without notice and without a hearing upon the merits of such rate change.

APPEAL by the Commissioner of Insurance from the decision of the Court of Appeals, reported in 29 N.C. App. 237, 224 S.E. 2d 223 (1976), from which *Martin, J.,* dissented. The Court of Appeals vacated orders issued by the Commissioner of Insurance in April 1975 concerning premiums to be charged for extended coverage and windstorm insurance.

On 6 January 1975, the North Carolina Fire Insurance Rating Bureau, hereinafter called the Bureau, filed for approval by the Commissioner of Insurance, hereinafter called the Commissioner, revisions in rates to be charged for extended coverage and windstorm insurance, the effect of the proposed rates being a reduction of 19% in such charges.

G.S. 58-131.1 provided, and now provides:

"No rating method, schedule, classification, underwriting rule, bylaw, or regulation shall become effective or be applied by the Rating Bureau until it shall have been first submitted to and approved by the Commissioner. * * * Every rating method, schedule, classification, underwriting rule, bylaw or regulation submitted to the Commissioner for approval shall be deemed approved, if not disapproved by him in writing within 60 days after submission."

The last sentence of this statute is known in the insurance industry and in the Department of Insurance and is referred to herein as the "deemer" provision.

On 5 March 1975, the Commissioner dispatched a letter to the Bureau stating, "It is not possible to schedule a public hearing on this filing at this time and you are requested to waive the deemer provisions of General Statute 58-131.1." This letter stated no reason for the inability of the Commissioner to schedule a public hearing at that time.

By letter dated 6 March 1975, one day before the deemer provision would take effect, the Bureau advised the Commissioner, "The captioned filing [the filing of 6 January 1975] is hereby withdrawn." The letter stated that this action was taken on advice of the General Counsel of the Bureau for the purpose of avoiding possible controversy as to the effect of the operation of the deemer provision and as to the effect of a waiver thereof by the Bureau. The record does not show when or if this letter was received by the Commissioner but nothing in the record, briefs or arguments on appeal indicates that it was not received in the usual course of the post; i.e., on 7 March 1975.

On 7 March 1975, instead of agreeing to waive the deemer provision, the Bureau dispatched a letter to the Commissioner acknowledging receipt of his request for such waiver and referring him to its letter withdrawing the filing.

On 11 April 1975, nothing else appearing in the record to have transpired, the Commissioner dispatched a letter, referred to in this proceeding by the parties as the "letter order." This stated:

> "Pursuant to authority conferred under General Statute 58-131.2 the reduction of 19% set forth in your filing is hereby approved. An additional decrease of 3.4% as determined by the attached rate development exhibit is also hereby approved.

> "You are directed to implement these reductions effective May 1, 1975."

On 22 April 1975, the Bureau filed with the Commissioner its motion to set aside the said "letter order" for the following reasons (summarized):

(1) The filing of 6 January 1975 with the statistical exhibits attached thereto was not before the Commissioner for his consideration or action at the time of the "letter order" or thereafter, having been withdrawn by the Bureau.

(2) The Commissioner gave to the Bureau no notice of his proposal to issue the said order and no opportunity was afforded the Bureau or any other person to be heard with respect thereto, this failure being alleged to be a violation of statutory provisions, of the constitutional right of the Bureau and its members to due process of law and of long established custom.

(3) The "letter order" was not supported by findings of fact or conclusions of law.

(4) No public hearing in North Carolina has been held on the subject of fair rates for extended coverage insurance for more than two years and the public interest would be served best by a full public hearing on "a revised and updated filing on extended coverage rates which filing is now being prepared for the North Carolina Fire Insurance Rating Bureau and is expected to be filed within the next thirty days."

The Bureau requested a hearing "on this motion" and determination thereof prior to 1 May 1975, the date upon which the "letter order" stated it would take effect. Attached to the motion was an exhibit showing "the history of consecutive and connected extended coverage filings of the years 1973, 1974 and 1975."

This exhibit attached to the motion of the Bureau showed:

On 8 January 1973, almost immediately after the Commissioner took office pursuant to his election by the people, the Bureau filed for his approval revisions in extended coverage and windstorm insurance rates, rules and forms. On 7 March 1973, the Commissioner wrote a letter to the Bureau with reference to that filing, which stated:

"It is not possible to schedule a public hearing at this time due to my very busy schedule. Therefore, I am requesting that you waive the deemer provisions of General Statute 58-131.1.

"A public hearing will be set as soon as my schedule permits."

On 9 March 1973, the Bureau wrote to the Commissioner advising him that, in accordance with his request, the Bureau waived the deemer provision but requested that the public hearing be set as soon as practicable. No such hearing having been set, the Bureau, on 22 June 1973, wrote a further letter to the

Commissioner advising him that its filing was "hereby withdrawn" for the reason that more recent experience data had become available for review, upon the completion of which review the Bureau would make a new filing.

The filing of 8 January 1973, so withdrawn on 22 June 1973, proposed a 23.3% reduction in premium rates.

On 21 September 1973, the Bureau made another filing with the Commissioner of proposed revisions in premium rates for extended coverage and windstorm insurance, this filing proposing a premium reduction of 22.6%, the approval of the Commissioner thereof being requested.

On 20 November 1973, the Commissioner wrote to the Bureau a letter which, except as to caption and date, was an exact duplicate of the above quoted letter of 7 March 1973, again requesting a waiver by the Bureau of the deemer provision. On 27 November 1973, the Bureau wrote the Commissioner that, in accordance with his request, it waived the deemer provision but requested that the public hearing be set as soon as practicable.

On 31 May 1974, no such hearing having been set, the Bureau again wrote the Commissioner withdrawing its filing dated 21 September 1973 for the reason that "more recent experience data are now available for review," and stating that upon the completion of such review a new filing would be made.

Nothing else transpired until the filing here in question on 6 January 1975.

The Commissioner notified the Bureau that "the hearing requested in your motion to set aside" the "letter order" would be held on 28 April 1975 and such hearing was held. At that hearing the filing of 6 January 1975 was introduced in evidence. Also introduced in evidence at the hearing were: The "letter order" of 11 April 1975, together with the statistical data attached thereto; the motion of the Bureau to set aside such order, together with the above mentioned attachments thereto; testimony of an actuary for the Bureau to the effect that in the filing the Bureau was saying that the proposed 19% reduction would provide an adequate premium rate through 1 December 1975, based upon the then available cost index; the letter of the Bureau withdrawing the filing, which letter, un-

like the letters of withdrawal of previous filings, did not state that a subsequent filing, based on more recent data, would be made; and a copy of the rules and regulations of the North Carolina Insurance Advisory Board adopted pursuant to G.S. 58-27.1.

The above mentioned rules and regulations adopted by the North Carolina Insurance Advisory Board contained the following provisions:

"1. Any rate adjustment or proposal involving a general revision of an existing rating schedule which the Commissioner or the Advisory Board finds upon investigation involves a material change in the rate level, or the setting up of a new rating schedule of a material nature for a kind of insurance or for a separately rated major subdivision thereof, shall be subject to a public hearing prior to action thereon by the Insurance Commissioner. Any proposal involving only a change or changes in specific items of an existing rating schedule shall not be subject to a public hearing unless the Insurance Commissioner, upon review, decides that a public hearing is justified and required by the nature and importance of the proposed change or changes and is in the public interest.

\* \* \*

"3. Public hearings herein provided for shall be conducted by the Commissioner of Insurance or, in his discretion, by any responsible person employed and duly authorized to act in his stead. \* \* \* "

At the conclusion of the hearing, the Commissioner announced orally that his decision was that the 19% reduction stated in the "letter order" would continue in effect but the additional 3.4% reduction would be set for a hearing on 12 May 1975. To this the Bureau excepted and gave notice of appeal to the Court of Appeals.

Thereafter, on 30 April 1975, the Commissioner issued a more formal written order affirming the "letter order" as to the 19% reduction and staying, pending a hearing on 12 May 1975, the further reduction of 3.4%. This written order of 30 April 1975 set forth findings of fact and conclusions of law. The findings of fact were:

"1. That by a filing dated January 6, 1975 (which filing is a part of the record in this matter) the Fire

Comr. of Insurance v. Rating Bureau

Bureau proposed a reduction in Extended Coverage premium rates of 19%, *without requesting a hearing on said proposal.* (Emphasis added.)

"2. That the Fire Bureau purported to withdraw said filing by letter dated March 6, 1975, which made no mention of statistics more recent than that contained in said filing being available.

"3. The statistics contained in said filing, including North Carolina non-catastrophe loss experience for the six year period 1968 through 1973 and countrywide catastrophe loss experience for the 26 year period 1947 through 1972, are the latest available Extended Coverage statistics before the undersigned Commissioner.

"4. That all the factors, allowances, and adjustments contained in said filing are reasonable, proper and correct, with the exception of the trended cost factor of 10.8%, which trended cost factor said filing used to trend to December 1, 1975.

"5. That a reasonable, proper and correct trended cost factor for trending the statistics contained in said filing should be based on trending to no later than December 1, 1975, and is no greater than 10.8%, which is appropriate for use at this time to determine the rate level decrease of 19% until a further hearing can be held to afford the Fire Bureau an opportunity to be heard on the additional 3.4% rate level decrease.

"6. That the loss ratio for the five year period 1968 through 1973 in North Carolina for Extended Coverage insurance; after adjustment by the filing current cost factor, the aforesaid 10.8% trended cost factor, the filing loss adjustment expense factor, and the filing allowance for the loss portion of the catastrophe element; is 46.6%.

"7. That a proper and correct balance point loss ratio (permissible loss ratio), reflecting a fair and reasonable profit, is 57.5%.

"8. That therefore current Extended Coverage premium rates are producing a profit in excess of what is fair and reasonable.

"9. That therefore a reduction of at least 19% is necessary to produce a fair and reasonable profit for Extended Coverage insurance.

"10. That the investigation by the undersigned Commissioner pursuant to G.S. 58-131.2, which investigation supports the letter order of April 11, 1975 determined the foregoing Findings of Fact based on the latest statistics available to the undersigned Commissioner, to wit, the filing dated January 6, 1975 * * * and that the Fire Bureau by its filing dated January 6, 1975, admits that there should be a rate decrease of at least 19% for Extended Coverage insurance."

The significant conclusions of law in the Commissioner's formal written order of 30 April 1975 were these:

"4. * * * [I]t is concluded that at least 19% reduction in Extended Coverage premium rates is necessary to produce a fair and reasonable profit in compliance with said provision of said Article.

"5. That the Fire Bureau by its filing of a proposed rate reduction admits that there should be a rate reduction of at least the amount set forth in such filing and is estopped from denying the validity and necessity for such rate reduction."

To the formal written order of the Commissioner, the Bureau gave notice of appeal to the Court of Appeals, specifying therein the grounds upon which it deemed such order to be "unlawful, unjust, unreasonable and unwarranted" and specifying the errors of law alleged to have been committed by the Commissioner.

Specifically, the Bureau asserted in such notice of appeal that the hearing before the Commissioner was "solely and exclusively on the appellant's Motion to Set Aside and rescind the Order and Decision of the Commissioner of April 11, 1975, and was not an investigation of the adequacy of the existing Extended Coverage rates"; that no notice was given that the Commissioner would attempt to convert such hearing into an investigation of rates by the Commissioner; and that no attempt was made by the Commissioner to develop accurate and precise data bearing on the "enlargement of the eroding effect of in-

flation of the very substantial period from January 5, 1975 until May or June or July, 1975."

The Court of Appeals concluded that G.S. 58-27.2(a) and the rules and regulations adopted by the North Carolina Insurance Advisory Board required the Commissioner, before acting upon the proposal for the 19% reduction, to hold a public hearing after due notice to the public. It concluded that, insofar as this statutory requirement for a public hearing may be repugnant to the "deemer provisions" of G.S. 58-131.1, the provisions of G.S. 58-27.2(a) requiring a public hearing, that being the later enacted statute must prevail. The Court of Appeals further concluded: The "busy schedule" of the Commissioner does not justify a failure by him to comply with this statutory requirement; the only hearing held by the Commissioner was solely to consider the Bureau's motion to set aside the "letter order"; by entering the orders from which this appeal is taken without conducting a public hearing as required by the statute, the Commissioner exceeded his authority; the Bureau had the right to withdraw the filing which it made on 6 January prior to the setting of a public hearing thereon. For these reasons, the Court of Appeals held the orders of the Commissioner should be reversed.

*Rufus L. Edmisten, Attorney General, by Isham B. Hudson, Jr., Assistant Attorney General, for Commissioner of Insurance.*

*Joyner & Howison by William T. Joyner, Henry S. Manning, Jr., and James E. Tucker for North Carolina Fire Insurance Rating Bureau.*

LAKE, Justice.

The North Carolina Fire Insurance Rating Bureau is a statutory agency created by the State "for the purpose of making rates and rules and regulations which affect or determine the price which policyholders shall pay for insurance." G.S. 58-125, 127. "For rate making purposes, the Bureau is to be regarded as if it were the only insurance company operating in North Carolina and as if it had an earned premium experience, an incurred loss experience and an operating expense experience equivalent to the composite of those of the companies actually in operation." *In Re Filing by Fire Insurance Rating Bureau,* 275 N.C. 15, 32, 165 S.E. 2d 207 (1968). Every company engaged in the writing of fire insurance policies, including

extended coverage endorsements attached thereto, is required to be a member of the Bureau. G.S. 58-127.

[1] There are two methods by which changes in premium rates for extended coverage insurance may be put into effect. First, the Bureau may file with the Commissioner of Insurance, for approval by him, a proposal for such change, either an increase or a decrease. G.S. 58-131.1. Second, the Commissioner, on his own initiative, may, after investigation, order a reduction or an increase in the premium rate when necessary to enable the operating companies (considered for this purpose as if they were a single company) to earn upon policies written in North Carolina a fair and reasonable profit. G.S. 58-131.2. The two methods overlap in the sense that in passing upon a proposal submitted by the Bureau the Commissioner need not approve or disapprove such proposal in its entirety but "upon proper findings of fact supported by substantial evidence, may fix premium rates at a level such as to allow part but not all of the increase [or decrease] proposed by the Bureau." *In Re Filing by Fire Insurance Rating Bureau, supra,* at p. 40. The two methods for changing premium rates are, however, separate and independent and the procedures prescribed by the statute in pursuing the one or the other method must be followed.

In the present instance, the Bureau filed a proposal that the premium rates for extended coverage insurance be reduced by 19% for the reason that premium rates then in effect were producing excessive profits and, with such reduction in effect, the profits of the companies (considered as if they were one company) would be fair and reasonable. The proposal, known to the Insurance Department and to the insurance industry as the "filing," carried attachments containing statistical data in support of the proposal. Nothing in the record before us indicates that these data were not sufficient to show, *prima facie,* that the proposed reduction in premium rates was proper and that, with such proposed rates in effect, the insurance companies would earn upon their North Carolina extended coverage business a fair and reasonable profit. The actuary and statistician for the Bureau, testifying at the hearing before the Commissioner on the motion of the Bureau to vacate the Commissioner's "letter order," testified that data available to the Bureau at the time of the filing so indicated.

[2]   Before the Commissioner took any action upon this filing and before the filing could go into effect pursuant to the "deemer" provision of G.S. 58-131.1, the Bureau notified the Commissioner that it was withdrawing the filing. We have heretofore said that when the Bureau makes a filing in which it proposes an increase in the premium rates, "unquestionably, the Bureau may amend its filing so as to propose a smaller increase in premium rates than that proposed in the original filing." *In Re Filing by Fire Insurance Rating Bureau, supra,* at p. 40. We find no merit in the contention of the Commissioner that once a filing is made the Bureau cannot withdraw it, but it remains before the Commissioner for his approval, disapproval or modification.

If a filing, once made, could never be withdrawn, it would follow that if the Bureau made a filing proposing a substantial increase in the premium rates which the Commissioner, with or without justification, failed to disapprove within 60 days after its submission, such increase would go into effect, at least temporarily, pursuant to the "deemer" provision of G.S. 58-131.1, even though the Bureau were to find that its calculations were in error and no increase was justified and were to advise the Commissioner of such error and of its desire to withdraw the proposal. It can hardly be supposed that the Legislature, by the enactment of Article 13 of Chapter 58 of the General Statutes, creating the Bureau, so intended. Nothing in the statute relating to filings by the Bureau supports the contention that a filing, once made, cannot be withdrawn for any reason satisfactory to the Bureau. In this respect, there is no basis for making a distinction between a filing which proposes an increase in the premium rate and a filing which proposes a decrease in such rate. We, therefore, hold that the Court of Appeals was correct in its determination that the Bureau was acting within its rights in withdrawing this filing. It is not necessary for us to determine, and we do not pass upon, the question of whether a filing may be withdrawn by the Bureau after the "deemer" provision puts it into effect or the Commissioner sets it for a public hearing. The filing in question was never set for hearing and was withdrawn within 60 days from its submission.

[3]   The Bureau having withdrawn its filing, that matter was at an end and there was, thereafter, no proposal before the Commissioner for a change in the premium rate for extended

coverage insurance. The matter was then as if no filing had ever been made, so far as the Commissioner's authority to order a change in the premium rate was concerned. The second method for bringing about a change in the premium rate, namely an independent investigation and action by the Commissioner pursuant to G.S. 58-131.2, was available to the Commissioner, just as it would have been had the Bureau made no filing at all. However, to pursue that method, the Commissioner must follow the procedure prescribed therefor. "Obviously, the Commissioner of Insurance has no authority to prescribe or regulate premium rates, except insofar as that authority has been conferred upon him by the above mentioned statutes. In exercising that authority, he must comply with the statutory procedures and standards." *In Re Filing by Fire Insurance Rating Bureau, supra,* at p. 33.

[4] This is not to say that the withdrawn filing is, by the withdrawal, obliterated from the records of the Insurance Department or that, in a proceeding initiated by the Commissioner, it cannot be considered by him. Such filing, together with the statistical data attached thereto, would be competent in evidence at a properly convened hearing before the Commissioner, pursuant to G.S. 58-131.2, as an admission by the Bureau that, as of the date of the filing, the therein proposed rates would be sufficient to yield to the companies (considered as one) a fair and reasonable profit upon their North Carolina extended coverage business. However, at such hearing, like any other extra-judicial admission, it would be subject to correction, clarification or modification by evidence of inconsistent or more recent information. Stansbury, North Carolina Evidence (Brandis Rev.), § 166, at p. 4 of Vol. 2, § 167.

The Commissioner, having no filing before him, issued his "letter order" directing a reduction in the premium rate for extended coverage insurance without notice to the Bureau or to the public, without conducting a hearing and without receiving any evidence or making any finding of fact. The subsequent orders of the Commissioner (one oral, the other a formal, written order) followed a hearing upon the motion by the Bureau to set aside the earlier "letter order." This hearing was necessarily limited to the determination of the Bureau's motion to vacate the earlier order. No notice thereof was given to the public and the notice thereof to the Bureau contained no information that the purpose of the hearing was to receive

evidence, make findings of fact and determine the premium level which would yield to the companies (considered as one) a fair and reasonable profit on their extended coverage business in North Carolina. Thus, the two orders, oral and written, made by the Commissioner following the hearing on the motion to vacate, must be deemed made without any notice or hearing as to the merits; i.e., the reasonableness of the then existing premium rates.

G.S. 58-131.5 provides:

> "*Hearing.*—The Commissioner shall not make any rule, regulation or order under the provisions of this Article without giving the Rating Bureau and insurers who may be affected thereby reasonable notice and a hearing if *hearing is requested.* All hearings provided for in this Article shall be held at such time and place as shall be designated in a notice which shall be given by the Commissioner in writing to the Rating Bureau * * * at least 30 days before the date designated therein. The notice shall state the subject of the inquiry.

> "At the conclusion of such hearing, or within 30 days thereafter, the Commissioner shall make such order or orders as he may deem necessary *in accordance with his finding* * * *." (Emphasis added.)

[5]  The Commissioner contends that this statute has no application and no hearing upon the merits was necessary in this instance because there was no request for such hearing by the Bureau. To acquiesce in this contention would be for us to shut our eyes to the obvious fact that the Bureau had no notice that the Commissioner contemplated a change in the premium rate pursuant to an independent investigation into the merits of the existing rates as authorized by G.S. 58-131.2. Having no notice that such action was in contemplation by the Commissioner and having withdrawn its filing, the Bureau had no reason to request a hearing on the merits of the existing premium rate level. Under the circumstances, the phrase "if hearing is requested" cannot be deemed to shield arbitrary rate fixing by the fiat of the Commissioner.

[6]  G.S. 58-9.2 provides that all hearings shall, unless otherwise specially provided, be held at such time and place as shall be designated in a notice given by the Commissioner, which

notice "shall state the subject of the inquiry." No notice whatever was given by the Commissioner to the Rating Bureau of his intent to convert the contemplated hearing on the Bureau's motion to vacate the "letter order" into an independent investigation of the reasonableness of existing premium rates for extended coverage insurance pursuant to G.S. 58-131.2. To so proceed without such notice and an adequate opportunity to the Bureau to present evidence as to the merits of the existing premium rate level must be deemed arbitrary and capricious. Thus, the resulting order may be reversed by the reviewing court pursuant to G.S. 58-9.6 (b) and, in so adjudging, the Court of Appeals committed no error.

G.S. 58-27.1 establishes within the Insurance Department an Insurance Advisory Board and authorizes that board to promulgate rules and regulations to provide for the holding of public hearings before the Commissioner (or any person employed by the Insurance Department and authorized by the Commissioner to act in his stead) on such proposals to revise an existing rating schedule so as to increase or decrease the charge for insurance or to set up a new rating schedule, if such proposals are subject to the approval of the Commissioner and, in the judgment of the board, are of such nature and importance as to justify and require such public hearing. This statute also authorizes the board to determine by its rules and regulations the circumstances under which such public hearing shall be held and requires the Commissioner of Insurance to hold public hearings in accordance with such rules and regulations.

The Insurance Advisory Board adopted rules pursuant to this statutory authority. Rule 1, so adopted, provides:

> "Any rate adjustment or proposal involving a general revision of an existing rating schedu'e, which the Commissioner or the Advisory Board finds upon investigation involves a material change in the rate level, or the setting up of a new rating schedule of a material nature for a kind of insurance or for a separately re'ated major subdivision thereof, *shall* be subject to a public hearing prior to action thereon by the Insurance Commissioner. * * *"
> (Emphasis added.)

[7] Obviously, a rate decrease of 19% (not to mention the additional 3.4% decrease ordered by the Commissioner in his "letter order") is a material change in the rate level. If Rule 1

were to be interpreted to permit the Commissioner to deny a hearing when he decides to embark upon an independent investigation, designed to produce a rate reduction of at least 19%, by the simple expedient of finding that this is not a material change in the rate level, it would raise serious doubt as to the constitutionality of the rule. When reasonably possible, a statute, or an administrative rule, should be construed so as to avoid serious doubt as to its constitutionality. *National Labor Relations Board v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352 (1937) ; 16 Am. Jur. 2d, Constitutional Law, § 146. We decline to construe this rule of the Insurance Advisory Board as giving such authority to the Commissioner. Clearly, G.S. 58-27.1(c) contemplated the holding of a public hearing before an order can be entered making such a material change in insurance premium rates. There was no error in the decision of the Court of Appeals that the statute and the rule require the Commissioner to hold a public hearing, after due notice, before entering the orders here in question.

The Court of Appeals stated that to the extent that there may be a conflict between this requirement of G.S. 58-27.2 and the "deemer" provision of G.S. 58-131.1, the provisions of G.S. 58-27.2 must prevail since that statute was enacted later than G.S. 58-131.1. The principle of statutory construction relied upon by the Court of Appeals is entirely sound. However, we do not consider it pertinent to this decision for the reason that the "deemer" provision has no application to this appeal. That provision appears in G.S. 58-131.1, which reads as follows:

> "*Approval of rates.*—No rating method, schedule, classification, underwriting rule, bylaw, or regulation shall become effective or be applied by the Rating Bureau until it shall have been first submitted to and approved by the Commissioner. * * * Every rating method, schedule, classification, underwriting rule, bylaw or regulation submitted to the Commissioner for approval shall be deemed approved, if not disapproved by him in writing within 60 days after submission."

[8, 9] Thus, the "deemer" provision has application only when there is before the Commissioner for his approval a filing by the Bureau. As above shown, at the time of the orders of the Commissioner from which this appeal is taken, there was no

filing by the Bureau so pending before the Commissioner, the filing of 6 January 1975 having been lawfully withdrawn by the Bureau. Thus, the question for determination on this appeal is, Can the Commissioner of Insurance, acting on his own motion, pursuant to G.S. 58-131.2, order a material reduction in insurance premium rates without notice and without a hearing upon the merits of such rate change? We hold that G.S. 58-27.1(c) and the rules of the Insurance Advisory Board, adopted pursuant thereto, forbid the Insurance Commissioner to do so.

The record discloses that, on three separate occasions since early 1973, the Rating Bureau (i.e., the insurance companies operating in North Carolina) applied to the Commissioner for permission to reduce substantially the rates of premium charged the people of North Carolina for extended coverage insurance. None of these proposed reductions could go into effect until approved by the Commissioner. G.S. 58-131.1. In each instance, had the Commissioner taken no action whatever, the proposed rate reduction would have gone into effect, after a 60 day waiting period, pursuant to the "deemer" provision of G.S. 58-131.1. In each instance, the people of the State have been deprived of the benefit of the rate reduction proposed because the Commissioner did not hold a hearing and requested the company not to put the deemer provision into effect. In each instance, it may well be that the Commissioner, in good faith and for good reason, did not consider the proposed reduction sufficient. We do not, in this decision, intimate any opinion as to the reasonableness of the existing premium rates, or of the proposed reduction therein. The merits of the reduction ordered by the Commissioner are not before us on this appeal.

In the last of these instances, no reason for the asserted inability of the Commissioner to hold the required hearing is mentioned in his request that the Bureau waive the "deemer" provision. In the first two instances, the Commissioner stated only that he was unable to hold the hearing "due to my very busy schedule," the nature of the conflicting activities not being shown. Assuming, as we do, that the Commissioner, then newly in office, found all of his time consumed by the necessary study of and discharge of his official duties, this is no justification for the failure to order and hold a hearing upon the proposed rate reductions. All hearings provided for by Ch. 58 of the General Statutes may be conducted either by the Commis-

sioner personally or "by one or more of his deputies, investigators, actuaries, examiners or employees designated by him for the purpose." Both the public and the insurance companies (acting through the Rating Bureau) are entitled to a prompt hearing of and determination of each proposal by the Bureau for a substantial change in the rates of premium charged. Such hearings must be held as required by the statute.

The "deemer" provision in G.S. 58-131.1 was designed by the Legislature to protect the insurance companies from the failure of the Commissioner of Insurance to perform, in person or through his deputy or other designated employee, this statutory duty. The companies (through the Bureau) are under no compulsion to waive this statutory protection against arbitrary delay in approving or disapproving their rate change proposals. Thus, the companies have a measure of protection against such official inaction. The public does not. If the Commissioner does not conduct hearings and determine the validity of rate changes proposed by the Bureau, these, including substantial rate increases, go into effect under the "deemer" provision without any opportunity on the part of the public to be heard in opposition thereto.

The availability of an application for a writ of mandamus to compel the holding of such a hearing, though not to control the decision thereat, pursuant to Rule 22 of the Rules of Appellate Procedure, 287 N.C. 730, is not presently before us. We are confident that no occasion to pass upon that question will arise in the future now that the duty of the Commissioner to hold hearings and determine the propriety of proposed rate changes filed with him by the Bureau has been determined by this appeal.

Affirmed.